

# NUMBER 13-11-00036-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

NOAH HERRERA, **Appellant,**

**v.**

THE STATE OF TEXAS, **Appellee.**

### On appeal from the 284th District Court of Montgomery County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Garza

Appellant, Noah Herrera, was convicted of capital murder, a capital felony, *see* TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2010), and intentionally or knowingly causing serious bodily injury to a child by omission, a first-degree felony, *see id.* § 22.04(a)(1) (West Supp. 2010).  Herrera was sentenced to life imprisonment without the possibility of parole for the capital murder count and forty years' imprisonment for the

injury to a child count, with the sentences to run concurrently. On appeal, Herrera claims (1) the evidence was legally insufficient to support his conviction for capital murder, and (2) his conviction for causing injury to a child was barred by double jeopardy. We affirm.[1]

## I. BACKGROUND

### A. State's Evidence

Joseph Yang Allen, M.D., a pediatric emergency physician at St. Luke's Hospital in The Woodlands, Texas, testified that paramedics brought three-year-old David Tijerina to the hospital's emergency room at around 7:20 p.m. on August 31, 2009. Dr. Allen was advised by paramedics that David had suffered cardiac arrest, that CPR was being performed, and that multiple doses of epinephrine and atropine were administered, but none of the treatments had any positive effect. When the child arrived at the emergency room, he was not moving and was breathing only with the aid of a bag valve mask. Additionally, David had "a tremendous number of bruises" on his body—most notably, a one-by-four centimeter bruise under his left eye, a one-by-three centimeter bruise to the left of his left eye, and several "very large" bruises "all over his abdomen" and "stretching around to the back" including a five-by-eight centimeter bruise on his left hip and a three-by-five centimeter bruise on his right hip. Dr. Allen testified that a child suffering these injuries would be "in an extraordinary amount of pain," may vomit excessively and may "become extraordinarily lethargic and listless." On cross-examination, Dr. Allen acknowledged that David also had a scratch on his scalp that could be consistent with his getting hit by a coat hanger.

---

[1] This appeal was transferred from the Ninth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX GOV'T CODE ANN. § 73.001 (West 2005).

2

Paramedics told Dr. Allen that the child had stopped breathing due to choking on milk; however, neither the paramedics nor any hospital staff saw any white liquid or milk in David's throat. Dr. Allen stated that, "[b]ased on what I was seeing I was concerned that that story did not match, given the tremendous number of bruises that the child had." Dr. Allen further stated that, because David's body temperature was only 93.5 degrees, because his heart did not respond to either epinephrine or atropine, and because rigor mortis had begun to set in, it was likely that the child "ha[d] been dead for a while" by the time he arrived at the hospital. Reasoning that further efforts to resuscitate would be futile, Dr. Allen pronounced David dead at 7:26 that evening.

Patricia Moore, D.O., a forensic pathologist, performed an autopsy. Dr. Moore testified that she examined the body and observed "several contusions and abrasions on the face, thorax, the sides near the pelvis, and there were some on the left lower leg." Dr. Moore stated that "[t]here were many" internal injuries as well, including hemorrhaging on the intestines, around the kidneys, and on the thymus, pancreas, and adrenal glands, as well as lacerations on the liver and spleen. There was a significant and unusual amount of blood pooled in the abdominal cavity. She also observed that David had suffered five fractured ribs and had a "large area of hemorrhage in the area of the right psoas muscle," which is at the back of the abdomen. According to Dr. Moore, these injuries are consistent with having been struck repeatedly with "severe" force, causing a "great amount" of pain. The injuries did not appear to have been caused by a coat hanger, and the fractured ribs could not have been caused by the administration of CPR if it was performed properly. Dr. Moore concluded that the injuries were suffered "in between six and 24 hours or less" prior to death, and that the

3

cause of death was "[b]lunt abdominal trauma."

On cross-examination, Dr. Moore conceded that she was not able to determine whether the injuries were caused intentionally or by accident, and that there was no indication, such as a visible imprint, that the injuries were caused by a person's hands. She agreed with defense counsel that a woman would "typically have sufficient strength to apply that type of force to cause any of the injuries" found on David's body. Dr. Moore further agreed that all of David's injuries appeared recent and there was no indication of "prolonged" child abuse.

Tammy Beck, Herrera's neighbor, testified that a young woman knocked on her door on the early evening of August 31, 2009, and asked if anyone knew CPR. Beck, who was trained in CPR, said yes and followed the woman to Herrera's residence across the street. At the residence, Beck observed David laying naked on a bed, motionless and not breathing. Pursuant to instructions from a 911 operator, Beck and a man also living at the residence moved David on to the floor. Beck began to perform chest compressions using the heel of her palm, and the man blew into David's mouth. Beck had never administered CPR to a child before, but she did not recall feeling that she was pressing too hard on David's chest—if anything, Beck testified, she pushed "[p]robably not hard enough." Beck and the young man continued to administer CPR until paramedics arrived. On cross-examination, Beck conceded that she was not trained in administering CPR to a child. She acknowledged that she later learned that chest compressions can be done on a child using two fingers rather than the heel of the palm.

The man who assisted Beck in performing CPR was Eric James Stowe. Stowe

4

testified that he and his common-law wife, Jennifer Duprie, lived on property belonging to Christina Tijerina, Herrera's mother-in-law, in Conroe, Texas. The property consisted of two buildings: a two-story house and a separate small building adjacent to the house which was called the "office." Christina lived on the bottom floor of the house with her boyfriend, Steven Chauvin; Herrera and his common-law wife, Crystal Tijerina, lived upstairs along with six children, including David[2]; and Stowe and Duprie lived in the "office." Stowe stated that he and Jennifer were friends with Christina, Herrera and Crystal and were "very close" with the children. Stowe testified that David was usually "very shy" and would sometimes "star[e] off into the distance" and "wouldn't answer you," but on other days David was "playing, laughing . . . like a normal three-year-old should."

Approximately two weeks after moving in, on August 29 or 30, 2009, Stowe and Duprie babysat the children for an evening at Herrera's request. At some point during the evening, David got his clothes wet and needed to be changed. Stowe said that Duprie changed his clothes and that he could see no bruises on David's body at that time.

According to Stowe, he was sleeping on the afternoon of August 31, when he was briefly awoken by the sound of Herrera's van leaving the property. Later, at around 4:00 p.m., Christina came to the "office" and "said [David] was throwing up." Christina "didn't seem worried about it," however, and "told [Stowe] that [David] was faking." Stowe subsequently went to the house to ask Christina for a cigarette. When he entered Christina's bedroom, he saw David laying motionless on a recliner with a towel

---

[2] The record reflects that four of the children living in the residence were Herrera's biological children.

5

draped over him. David was "just staring up at the ceiling" and "didn't look right." Stowe observed vomit "all over the place." Herrera was not there. Stowe became very concerned and told Duprie to get ready to go to the hospital. According to Stowe, "[w]hen I said, [']Let's take him to the hospital,['] [Christina and Crystal] started acting like it was their idea basically, you know, like, okay, that was their plan. . . . Which it wasn't, obviously." Crystal was carrying David to Stowe's car when she noticed David wasn't breathing. Stowe then grabbed David from Crystal's arms, laid him on the floor in the "office," and began administering CPR. He told Christina to call 911, and he told Duprie "to run to the neighbor or run anywhere and get some help." Stowe then noticed David's extensive bruising. When he asked Christina about it, Christina said David "fell out of his car seat when [Herrera] was driving," but Stowe dismissed that story because "[c]hildren don't get black eyes like that from falling." Stowe felt that David's hands were cold to the touch—"like he had held his hands in front of an air conditioner for a couple of minutes." Paramedics arrived soon thereafter, and according to Stowe, Christina then

> acted like she had a seizure, which—I have had a seizure before, and I thought it was fake. She just fell on the ground, started shaking, and after a couple of seconds she was up and alert. I mean I remember I had a seizure and I didn't even know my name for a couple of hours.

After paramedics left to take David to St. Luke's Hospital, but while there were still law enforcement vehicles and ambulances parked outside the house, Stowe observed Herrera's van pass by the house and stop at a driveway several hundred feet away. Stowe tried to get the attention of the two men in the van:

> I was waving and yelling. I yelled, [']Hey, come on. Something is wrong. Something happened. Come back.['] I was waving. I can't say that I saw who—exactly who it was, but I saw them walking around the van. They

6

were looking our way. . . . [A]fter a few minutes the van was gone. I can't say what they did.

On cross-examination, Stowe acknowledged that he did not mention the babysitting or David's lack of bruises at that time in a statement that he later gave to police. He did not know why the police report stated that he and Duprie babysat the children on August 27, instead of on August 29 or 30, as he had recalled. And, although Stowe observed Herrera interact with the children almost every day, he never saw Herrera mistreat David in any way, nor did he ever see Herrera spank a child.

Paul Hahs, a detective with the Montgomery County Sheriff's Office, stated that he conducted interviews at the scene. Crystal stated that Herrera had told her that David suffered his injuries as a result of falling inside a van and striking his eye on the dashboard.[3] Detective Hahs stated that this explanation "wasn't consistent with the injuries that were being described to me by the [d]eputies and [d]etectives at the hospital." Detective Hahs stated that, through his investigation at the scene, he determined that custody of David belonged to Crystal and Herrera. David was Crystal's nephew. When David's biological mother died in January 2009, he moved in with Crystal and Herrera. A forensic interviewer later interviewed the children; none of the children made any outcries of abuse to the interviewer, and CPS's subsequent investigation revealed that none of the other children were injured.

Detective Hahs stated that on the following day, September 1, Herrera was apprehended by a police SWAT team and arrested based on "some outstanding traffic warrants he had through Precinct 4 Montgomery County." Police interviewed Herrera

---

[3] According to Detective Hahs, Christina originally gave permission for police to search her property, then withdrew that permission when Child Protective Services arrived to take custody of the other children. Police instead obtained a warrant to search the premises.

7

and a redacted video recording of the interview was admitted into evidence. In the interview, when Herrera was asked where he was when police were attempting to locate him, Herrera stated that he went to "a couple of convenience stores to purchase diapers" and went to a liquor store. He later spent the night in his van in a parking lot. Chauvin was with him the entire time.

Sergeant Jerry Thomas, also of the Montgomery County Sheriff's Office, testified that he conducted another interview of Herrera, at Detective Hahs's request, on September 2, 2009. Prior to the interview, Herrera signed a form indicating that he understood his *Miranda* rights and waived them; the form was introduced into evidence at trial. A redacted video recording of this second interview was also admitted into evidence, over defense counsel's objections.

## B.    Defense Evidence

Florence Herrera, appellant's mother, testified that her son "was the mama and the daddy" of the household that he shared with Crystal. "He used to cook, clean the house. He used to do everything. . . . I would sometimes tell him that he was doing too much." When David came to live with the family, Herrera treated David "like if he was his son." Herrera "would take care of [David] like his other four children." Florence never saw Herrera abuse or spank any of the children, and she stated that her son was not capable of the abusive conduct with which he is charged. On cross-examination, Florence agreed with the prosecutor that she did not often visit Herrera and Crystal because she didn't "approve of the way that they were living" or "the way they were raising the children." Specifically, Florence believed that her son and Crystal did not bathe or clean the children properly; however, Florence said the children were always

8

fed and that her son was a good father.

Amparo Makridis, a psychotherapist, testified that she started treating Herrera's biological children—Angelina, Moses, Florence and Joseph—in October 2009. At a session with four-year-old Florence on July 12, 2010, Makridis asked Florence about her cousin David's death. Florence "expressed thoughts and feelings about her family and her cousin that died" and she "reflected on how her mom used to be angry with David and used to hit him with a clothes hanger because he cried all the time." Florence mentioned that, on the day he died, David "had a big bruise in his head." On December 15, 2009, nine-year-old Moses spoke to Makridis about David's death. Moses "said that his mother was angry with [David] and she hit him with a hanger." Moses did not know why his mother was angry with David. Eight-year-old Angelina also talked to Makridis about David's death. Angelina noted that David was "sick" on the day he died and that she was told "he fell from the stairs."

Rebecca Nickerson served as foster mother for two of Herrera's children, Joseph and Florence, beginning on September 1, 2009. Nickerson testified that Florence came to her excitedly on September 2, 2009 and said that, on the day that "the ambulance came," David "peed on the couch and . . . her mother got mad and started hitting him." Florence "said [David] was on the floor and he was throwing up and . . . he ca-ca'ed on himself." Florence told Nickerson that her mother then said "I'm in big trouble now." Florence repeated this account to Nickerson on other occasions. Florence expressed that she was afraid of her mother, but she never exhibited any fear of Herrera.

Lloyd White, M.D., a Deputy Medical Examiner for Tarrant County, also was called to testify by the defense. Dr. White stated that, based on his review of David's

9

medical records, his rib fractures were "caused by compression or squeezing of the chest," but "not the kind of compression or squeezing that is typically associated with [CPR]." Dr. White stated that "a person of average strength could inflict injuries of this type on a child." He further testified that David's death was indeed caused by repeated blows to the abdomen, and he agreed that the death was correctly ruled a homicide.

Herrera took the witness stand on his own behalf. He stated he was the primary caregiver for the children in the Tijerina household, and he had earned the nickname "Mr. Mom." When he had to take a job in Austin that required extensive travel, Crystal "never picked up her duties" for caring for the children; instead, Herrera "still continued to do what I did from the beginning and take care of them." Herrera had seen Crystal discipline David with metal and plastic coat hangers, but Herrera denied that he had ever hit the children with any object. He stated that he "very rare[ly]" spanked any of the children, and that when he did so, he would use "[a]n open hand at all times" and would never spank the children anywhere "above the butt." Herrera agreed that Crystal and Christina were the "primary disciplinarians" in the house. Herrera expressed his disapproval of Crystal's use of coat hangers to discipline the children, but "it didn't stop."

Herrera admitted that he had used marihuana and methamphetamines at various times "during [his] adult years," and that he had been dependent on alcohol. He denied that the use of these substances ever caused him to be angry or aggressive toward the children.

One or two days prior to David's death, Herrera took David and two-year-old Joseph in his van to get diapers. Though Herrera owned two infant car seats, only one was clean, so Herrera put Joseph in the car seat and buckled David in the middle back

10

seat using an adult seat belt. At some point, David started to "struggle" to look out the window, so Herrera told David to unbuckle his belt and move to the front passenger seat. Herrera continued to drive as he reached back and attempted to help David unbuckle. Soon after David was able to unbuckle himself and make his way toward the front passenger seat, the vehicle stopped short at a stop sign. The stop was "pretty rough" and David "flew forward and hit the dashboard." He "received a cut on his mouth and on his—under his eye."

In the early morning hours of August 31, after Herrera had been using methamphetamine, marihuana and alcohol, he spanked Joseph and David. According to Herrera, the reason he disciplined the children was that they "asked me for some food, and we didn't have too much food at the time. And I gave them some cereal and they threw it; threw it all over the floor, playing around with it." Herrera stated that he "grabbed [David] by the wrist, lifted him a tiny bit where he was on his tippy toes and spanked him on his butt with my open hand." He denied hitting David anywhere above "the butt." Herrera went to sleep at around 5:00 a.m. and was awakened by Chauvin at around 3:00 that afternoon. Christina mentioned to Herrera that David was sick; Crystal told Herrera that David was vomiting, that "[h]is head keeps going side to side," and "[h]e can't keep anything down." Herrera went downstairs to check on David and saw that he was vomiting. Herrera testified that the only bruise he observed on David at that time was under David's eye. Herrera stated that he initially wanted to take David to the hospital at that time, but Christina said "'You can't take him. For one, he doesn't have a diaper on; two, he has a bruise on his eye; and three, they will arrest you [for unpaid

11

child support and outstanding warrants].”[4] Herrera decided against taking David to the hospital at that time.[5] Herrera “just assumed it was a stomach virus.”

At that point, Herrera and Chauvin left the house in Herrera's van in order to “find a little convenience store to buy diapers.”[6] They drove around looking for an ATM, but could not find one. They went to a gas station to buy diapers, but Chauvin's credit card was denied. They spent as much as an hour attempting to purchase diapers at “seven [or] eight [or] more” other stores, before they were finally able to do so at an Exxon station. At some point during the journey, Herrera and Chauvin stopped at a pawn shop, which was closed. After they obtained the diapers, they stopped at a liquor store to purchase beer, which Herrera drank in the parking lot.

When Herrera and Chauvin arrived back at the residence, Herrera saw a police car with flashing lights at the end of the driveway. He did not see an ambulance or fire truck. Herrera parked his van in a nearby driveway for “two to five minutes.” He did not return home because he “was assuming that the cops were looking for me or somebody in the house.” Herrera stated that, though he was driving the van that day, he has never had a valid driver's license.

Herrera testified that, while he was riding in the van that afternoon, he was not aware of the extent of David's injuries, nor was he aware that police were looking for

---

[4] Herrera testified that he owes “a lot of money” in child support to the mother of his older children, who do not live with him. He also testified that he “had a CPS case open” and he was not supposed to be at the house at that time due to the safety plan put in place by CPS. According to Herrera, that plan was instituted because, at some point previously, he and Crystal “were drinking and we got into an argument and I slapped her, and she called the cops.”

[5] Herrera would later state on cross-examination that “I was only aware of the bruises on [David's] face. I was not aware of the bruise[s] on his body. If I would have saw those bruises on his body, I would have immediately took him as well to hospital right then and there without the diapers.”

[6] According to Herrera, he and Chauvin also left the house because they were informed that one of Crystal's other children needed to be picked up from school. When they arrived at the school, they were told that the child had already left on a bus.

him. He was not told that David had been rushed to the hospital until later that evening. Herrera did not go to the hospital out of fear that he would be arrested. He slept in the van that night, also because he "was assuming there [were] still cops looking for me." The next day, Crystal called Herrera to inform him of David's death. Crystal asked Herrera and Chauvin to meet at a parking lot; when they arrived, they were instead met by a police SWAT team, who arrested them.

Herrera denied lying in any of the interviews he later had with police. He testified that Sergeant Thomas did not disclose that he was a police officer but rather stated that he was there as an "advocate" for Herrera and "a neutral observer." At the beginning of the interview with Sergeant Thomas, Herrera began praying and saying that he "was willing to take responsibility . . . [f]or anything that might have happened," including David's death. He "still felt in [his] heart that [he] did not do it," but Sergeant Thomas convinced him that "maybe . . . anything was possible." By the end of the interview, Herrera acknowledged that he did not have "absolute knowledge of what happened" to David. Herrera denied admitting to police that he struck David above "the butt."

In the interview, Herrera speculated that Christopher Dore—an ex-boyfriend of both Christina and David's deceased mother—might be responsible for David's injuries. Herrera believed that Dore was "jealous" because "[h]e might have thought that David might have been his" biological son.[7] Herrera said that Dore was present at the house the night before David's death, but that Dore left early in the morning of August 31.

When asked by police what he would say to David if he had a chance to talk to him, Herrera said "I'm sorry. I didn't think that I was hitting you so hard." According to

---

[7] Herrera testified that the identity of David's biological father had never been established.

13

Herrera, he was "led to believe that" by Sergeant Thomas. "He kept drilling it in my head. Every time I tried to tell him it wasn't me, he wouldn't hear it. He'd cut me off." Herrera stated he wouldn't have trusted Sergeant Thomas's evaluation of the facts of the case if he had known that the officer was not actually his "advocate" as he had claimed to be.[8]

On cross-examination, Herrera acknowledged that he had "care, custody and control" of David at the time of his death. He acknowledged that he told police that, when he spanked Joseph and David in the early morning hours of August 31, he did so with such force that it hurt his wrist. Herrera further conceded that, in his interviews with police, he never mentioned seeing Crystal or Christina physically discipline the children.

## II. DISCUSSION

### A. Sufficiency of the Evidence

By his first issue, Herrera contends the evidence adduced at trial was legally insufficient to support his murder conviction because he was "not the only person who had access to [David] during the last days of August 2009" and because "[n]o witness testified to observing [him] inflict any injuries on [David]."

In reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences

---

[8] Sergeant Thomas acknowledged in his testimony that he lied to Herrera when he said he was Herrera's "advocate," and he stated that the telling of such lies during interrogation of suspects is common police procedure.

from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* Here, such a jury charge would state that Herrera was guilty of capital murder if (1) he intentionally or knowingly (2) caused David's death, and (3) David was under six years of age.[9] *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003), § 19.03(a)(8). A person acts intentionally when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2003). A person acts knowingly when he is aware of the nature of his conduct or that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

We first note that the State presented no direct evidence of Herrera's guilt other than the ambiguous confession he made to Sergeant Thomas. However, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

We next observe that much of the evidence presented at trial could have generated a reasonable doubt as to Herrera's guilt in the mind of a rational juror. In

---

[9] It is undisputed that David was under six years of age at the time of his death.

15

fact, perhaps the strongest direct evidence of guilt presented at trial was the outcry of the child Florence, who repeatedly told her foster mother Nickerson that Crystal "got mad and started hitting" David on the same day that "the ambulance came" to the house, and that her mother then said, "I'm in big trouble now." Moses, in discussing David's death with his therapist, corroborated Florence's outcry statement. The evidence did not establish Crystal's whereabouts during the morning hours of August 31, 2009. The witnesses were unanimous in describing Herrera as a good father who did not use excessive force in disciplining his children. And there was no testimony calling Herrera's reputation for honesty into question.

But Herrera did admit to striking David on the day of his death. In his interview with Sergeant Thomas, before which Herrera was fully advised of his *Miranda* rights, Herrera appeared to admit responsibility for David's death. Also in the interview, Herrera stated that he hit David with such force that it hurt Herrera's wrist. A rational juror could have believed this evidence while disbelieving the outcries made by Florence and Moses and disbelieving Herrera's insistence that he never hit David "above the butt." *See Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("Even when a witness's testimony is uncontradicted, the jury can choose to disbelieve a witness."). Further, a rational juror could have determined that Herrera's flight from the scene was indicative of a guilty conscience, *see Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983) ("Flight is also a circumstance indicating guilt."), and it could have disbelieved Herrera's testimony that he fled only because of other pending penal predicaments. Thus, while a rational juror *could* have

16

harbored reasonable doubt as to whether Herrera beat David to death, it would be incorrect to say that a rational juror *must* have had such doubt.

The evidence regarding Herrera's intent to kill David was similarly weak. Other than Herrera's statement that he spanked David for throwing food on the floor, no witness testified as to a possible motive for Herrera to intentionally or knowingly kill David. It was suggested by the State that Herrera purposefully ended David's life merely so that his child-rearing responsibilities would be somewhat alleviated. In any event, it is well-established that intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Intent may also be inferred from the extent of the victim's injuries and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, a particularly brutal or ferocious mechanism of death, inflicted on a helpless victim, can be controlling upon the issue of intent or knowledge. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding that evidence of severe brain injuries was sufficient to show intent to kill ten-month-old victim). In this case, because the jury could have rationally concluded beyond a reasonable doubt that Herrera severely beat David, the jury could have also inferred Herrera's culpable intent. In a sense, the jury stacked its inference of Herrera's intent atop the already-existing inference that Herrera was the one who caused David's injuries and death. Jurors in criminal cases are permitted to stack inferences as long as each inference in the chain is reasonable. *Hooper*, 214 S.W.3d at 16 ("[J]uries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to

17

draw conclusions based on speculation."). Aware as it was of David's severe injuries and of Herrera's admission that he spanked David with such force that it hurt Herrera's wrist, the jury was reasonable in inferring that Herrera beat David to death. Having reasonably inferred Herrera committed that act, the jury was further reasonable in inferring that Herrera committed that act intentionally or knowingly. *See Guevara*, 152 S.W.3d at 50; *Patrick*, 906 S.W.2d at 487; *Martin*, 246 S.W.3d at 263.

Having examined all of the evidence in this case, we cannot say that we are convinced of Herrera's guilt. But that is immaterial. The duty of this Court is not to determine whether *we* believe the evidence showed Herrera's guilt beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We are not to act as a thirteenth juror and reassess the evidence or the credibility of the testimony. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988) (employing *Jackson* standard); *see Brooks*, 323 S.W.3d at 911 ("We decline to question over 150 years of criminal and civil jurisprudence in this State and construe constitutional and statutory mandates to review 'questions of fact' to also require direct-appeal courts to sit as 'thirteenth jurors' in criminal cases."). Rather, we are tasked only with deciding whether *any rational juror* could have found that essential elements of the crime were proven beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 895 (citing *Jackson*, 443 U.S. at 319). In doing so, we must view the evidence in the light most favorable to conviction. *Id.* Because we are bound to follow these tenets of law, we conclude that a rational juror could have found Herrera's guilt beyond a reasonable doubt. Accordingly, the evidence was sufficient to support the capital murder conviction. Herrera's first issue is overruled.

18

**B.    Double Jeopardy**

By his second issue, Herrera contends that his conviction for injury to a child violated the double jeopardy clause of the Fifth Amendment to the United States Constitution.  *See* U.S. CONST. amend. V.

The double jeopardy clause, applicable to the states through the Fourteenth Amendment, *see id.* amend. XIV, protects an accused against a second prosecution for the same offense for which he has been previously acquitted or previously convicted. *Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008) (citing *Brown v. Ohio*, 432 U.S. 161, 164 (1977)).  It also protects an accused from being punished more than once for the "same offense."  *Id.*  "Sameness in this context is a matter of legislative intent." *Id.* (citing *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *Ex parte Kopecky*, 821 S.W.2d 957, 959 (Tex. Crim. App. 1992)); *see Albernaz v. United States*, 450 U.S. 333, 344 (1981) ("Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.").  We presume that the Legislature did not regard two statutorily defined offenses to be the "same" if "each provision requires proof of a fact which the other does not."  *Id.* (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  On the other hand, even when two offenses are construed as prohibiting the "same" conduct, a defendant may still be constitutionally punished for both offenses "if the Legislature has . . . made manifest its intention that he should be."  *Littrell*, 271 S.W.3d at 276; *see Hunter*, 459 U.S. at 368–69 (holding that, where the law specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct, "a court's task of statutory construction is at an end and the prosecutor may seek and the

19

trial court or jury may impose cumulative punishment under such statutes in a single trial.").

Section 22.04 of the penal code defines the offenses of injury to a child, injury to an elderly individual, and injury to a disabled individual. *See* TEX. PENAL CODE ANN. § 22.04. Subsection (h) of that section states in part: "A person who is subject to prosecution under both this section and another section of this code may be prosecuted under either or both sections." *Id.* § 22.04(h).[10] In *Williams v. State*, another case where a defendant was convicted of both capital murder and injury to a child and challenged the latter conviction on double jeopardy grounds, the First District Court of Appeals held that subsection 22.04(h) represents a "clear" expression of legislative intent to allow multiple punishments. Nos. 01-07-00296-CR & 01-07-00297-CR, 2009 Tex. App. LEXIS 4201, at *7–8 (Tex. App.—Houston [1st Dist.] June 11, 2009, pet. ref'd) (op. on reh'g). In *Johnson v. State*, the Austin Court of Appeals similarly held that, because of section 22.04's clear expression of legislative intent to allow multiple punishments, the double jeopardy clause does not bar simultaneous prosecutions for injury to an elderly individual and capital murder. 208 S.W.3d 478, 511 (Tex. App.—Austin 2006, pet. ref'd) ("[Subsection 22.04(h)] plainly authorizes multiple punishments when a defendant's conduct violates both section 22.04 and another penal code section."). In other cases, courts have held that double jeopardy is no bar to prosecution under both section 22.04 and other penal statutes. *See Jimenez v. State*, 240 S.W.3d 384, 417–18 (Tex. App.—Austin 2007, pet. ref'd) (injury to a child and

---

[10] Subsection (h) also provides that, "[i]f a criminal episode is prosecuted under both this section and another section of this code and sentences are assessed for convictions under both sections, the sentences shall run concurrently." TEX. PENAL CODE ANN. § 22.04(h) (West Supp. 2010). In compliance with the statute, the trial court ordered Herrera's sentences to run concurrently.

20

murder); *Mayhew v. State*, 271 S.W.3d 294, 300–01 (Tex. App.—Beaumont 2008, no pet.) (injury to a child and endangering a child); *McCrary v. State*, 327 S.W.3d 165, 171–72 (Tex. App.—Texarkana 2010, no pet.) (injury to elderly individual and aggravated assault).

Herrera does not present us with any reason to deviate from this precedent. Accordingly, we conclude that subsection 22.04(h) of the penal code "specifically authorizes cumulative punishment" under section 22.04 and another penal statute. Therefore, Herrera's convictions and punishments for both capital murder and injury to a child do not violate the double jeopardy clause. *See Hunter*, 459 U.S. at 368–69. Herrera's second issue is overruled.

## III. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
20th day of October, 2011.

21